Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



★ ★ ★  ★ ★ ★

# OPINION

No. 04-08-00180-CV

**BAY ROCK OPERATING COMPANY**,
Appellant/Cross-Appellee

v.

**ST. PAUL SURPLUS LINES INSURANCE CO.**,
as Subrogee and Real Party in Interest for Hollimon Oil Corp., and Feliciana Corp., Duncan
Underwood, Everett Desha, and Seeligson Oil Company, Ltd.,
Appellees/Cross-Appellants

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-CI-03287
Honorable Janet P. Littlejohn, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:        Catherine Stone, Chief Justice
                Karen Angelini, Justice
                Phylis J. Speedlin, Justice

Delivered and Filed:   April 1, 2009

AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND
REMANDED IN PART

St. Paul Surplus Lines Insurance Company ("St. Paul") sued Bay Rock Operating Company

("Bay Rock") in the name of, and as subrogee of, its insured, well operator Hollimon Oil

Corporation ("Hollimon").  The suit alleged that Bay Rock committed negligence, gross negligence

and breach of contract in planning and supervising the drilling of the Striebeck No. 1 Well, located

in Live Oak County, Texas, which resulted in a blowout and fire.  Four working interest owners,

Feliciana Corporation, Duncan Underwood, Everett Desha, and Seeligson Oil Co., Ltd., who together represent 35% of the working interest in the well also joined the suit in their individual capacities. The suit sought to recover from Bay Rock the damages caused by the blowout, including the costs to control the well, repair, evaluate and complete the well, redrill a nearby second well, and the value of lost gas. After a jury trial, and the resolution of post-trial motions, the trial court entered a final judgment for Hollimon and St. Paul in the amount of $1,799,012.70, plus prejudgment interest, on the negligence claim. The trial court disregarded the jury's award of a separate $1 million in damages for lost gas to the four working interest owners. Both sides appealed. For the reasons discussed below, we affirm the portion of the trial court's judgment finding liability against Bay Rock and awarding St. Paul its recovery in subrogation; however, we reverse the portion of the judgment concerning the other damages to be awarded, and render in part and remand in part as to those additional damages.

## FACTUAL AND PROCEDURAL BACKGROUND

J. Charles Hollimon, Ltd. is the manager of an oil and gas contract area in Live Oak County, Texas and the generator of the lease prospect on which the Striebeck No. 1 Well was drilled. It designated Hollimon Oil Corporation to be its agent and the well operator pursuant to a Drilling and Operating Agreement, which incorporated a Joint Operating Agreement describing the rights and responsibilities of the operator and working interest owners. Charles Hollimon is the principal of both entities. As required by the Joint Operating Agreement, Hollimon obtained a blowout insurance policy with St. Paul (the "Policy") covering the well. The Policy contains a subrogation clause.

Hollimon then hired Bay Rock to design, plan, and supervise the drilling of Striebeck No. 1 Well. In turn, Bay Rock recommended Unison Drilling, Inc., a drilling contractor, to physically

drill the well, and Hollimon hired Unison. Bay Rock's engineer, John MacDiarmid, prepared the drilling program for the well. MacDiarmid decided to use a drilling rig from Unison that had a 3,000 pound blowout preventer, believing that would be sufficient for this well. The blowout preventer had two main components: (i) a Reagan annular which contains a rubber bladder that closes around the drill pipe; and (ii) Shaffer pipe rams comprised of two steel plates that can seal around the pipe more tightly than the annular. Both are operated by hydraulic pressure. A device called a closing unit or accumulator is connected to the blowout preventer and controls the hydraulic fluid necessary to open and close, and maintain pressure on, the two preventer components; if the hydraulic fluid runs out, the blowout preventer will fail. In addition, MacDiarmid hired Ted Reichert to be Bay Rock's representative, or "company man," who would stay on-site and oversee the day-to-day drilling process. Reichert was in communication with MacDiarmid several times each day.

When the drilling reached a depth of over 7,000 feet and the crew was setting the intermediate casing, they encountered a weak zone which caused them to lose circulation as the liquid mud leaked into the surrounding formation. To counteract that, Reichert instructed the drilling crew to perform a "squeeze job" repair by pumping liquid cement into the pipe and forcing the cement into the formation to fill the cracks where the liquid mud was leaking. MacDiarmid had instructed Reichert to conduct a "formation integrity test," or casing shoe test, when they set the intermediate casing to ensure the formation and casing seat could withstand the expected levels of pressure as the drilling progressed deeper. Believing he had conducted an equivalent test when he drilled through the "squeeze job," Reichert did not think the formation integrity test was necessary, and did not conduct it. Instead, drilling was continued beyond the intermediate casing seat. When

MacDiarmid learned that Reichert had not performed the formation integrity test, he did not halt the drilling to conduct the test, but permitted the drilling to continue.

Then, on the evening of August 5, 2003, a gas kick occurred in which gas began flowing into the hole, pushing the drilling mud out into the formation and increasing the pressure in the hole and ultimately at the surface. Reichert ordered the annular component of the blowout preventer to be closed, but it began leaking and shortly thereafter its rubber bladder burst, causing hydraulic fluid to leak out. At that point, the pipe rams were closed, but there was not enough hydraulic pressure to hold them shut and they eventually failed. The rig was evacuated at that time, and within one to two hours a blowout occurred at the surface, causing the rig to burn. The reason for this sequence of events was the crux of the dispute at trial.

Hollimon filed a claim under the Policy with St. Paul for the loss sustained at the well due to the blowout and fire. St. Paul issued a reservation of rights letter, contending the claim was not covered under the Policy. Subsequently, St. Paul settled with Hollimon, advancing $2 million to cover the payment of third party vendors and later paying it an additional $857,788. As subrogee, St. Paul then filed suit against Bay Rock in the name of Hollimon, its insured. As noted, four of the working interest owners also joined the suit against Bay Rock seeking their uninsured damages fro lost gas. Bay Rock answered and filed a third party contribution claim against Unison Drilling. Summary judgment was granted in favor of Unison on the contribution claim and Bay Rock nonsuited Unison. Bay Rock then designated Unison as a responsible third party pursuant to section 33.004 of the Texas Civil Practice & Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. § 33.004 (Vernon 2008).

After a seven-day trial, a jury found Bay Rock liable for negligence and breach of contract. The jury found Bay Rock 51% negligent, and Unison 49% negligent. Hollimon was found 0% negligent. Total damages of $4,527,476 resulting from the "occurrence," *i.e.*, the blowout, were awarded to Hollimon as follows: $1,527,476 as the cost to control the well; $2 million as the cost to repair, complete and evaluate the well; and $1 million as the value of the lost gas from the well. The jury awarded $0 as the cost to redrill a nearby well.

The plaintiffs elected negligence as their remedy and moved for entry of judgment on the jury verdict. Bay Rock filed motions for judgment notwithstanding the verdict and for a new trial. After post-trial briefing, the trial court granted Bay Rock's motion for judgment notwithstanding the verdict in part, and disregarded the jury's award of $1 million in lost gas damages to the four working interest owners. The trial court also found that Bay Rock was not jointly and severally liable for its 51% negligence, and reduced the damages award by 49%—the amount attributed to Unison as responsible third party. A final judgment was entered for Hollimon and St. Paul awarding total damages of $1,799,012.70. Both sides filed notices of appeal. We will address Bay Rock's direct appeal first.

## I. DIRECT APPEAL BY BAY ROCK

In its direct appeal, Bay Rock asserts three main issues: (1) St. Paul failed to prove that it is entitled to recover as a subrogee to Hollimon; (2) the evidence is legally and factually insufficient to prove Bay Rock's negligence was a proximate cause of the blowout; and (3) St. Paul is not entitled to recover prejudgment interest. We begin by addressing the subrogation issue.

## SUBROGATION

Both sides agree that whether St. Paul had a right to subrogation is a question of law to be determined by the trial court; thus, the trial court's ruling on that question is reviewed *de novo*. *See Myers v. Thomas*, 143 Tex. 502, 186 S.W.2d 811, 812-13 (1945); *Hartnett v. Hampton Inns, Inc.*, 870 S.W.2d 162, 167 (Tex. App.—San Antonio 1993, writ denied); *Pacesetter Pools, Inc. v. Pierce Homes, Inc.*, 86 S.W.3d 827, 830-31 (Tex. App.—Austin 2002, no pet.).

***Bay Rock's Arguments***.   Bay Rock concedes in its reply brief that St. Paul had a right to bring a subrogation action in the name of its insured, Hollimon, but asserts the mere existence of the *right* to subrogation does not resolve the matter.  Bay Rock argues that St. Paul was obligated to prove certain additional elements establishing its ability *to recover* on that subrogation right: (i) "how much" it could recover; and (ii) "when" it could recover.  Specifically, Bay Rock argues the evidence was legally and factually insufficient to prove that St. Paul's insurance settlement was for a "covered loss" under the Policy (*i.e.*, the "how much" it could recover element), and that Hollimon had a right to recover any loss from Bay Rock (*i.e.*, the "when" it could recover element).  As to whether Hollimon had a right to recover for any loss from the blowout, Bay Rock further contends that Hollimon did not itself sustain an actual loss from the blowout because it has no ownership interest in the well, and under the Joint Operating Agreement Hollimon had no right to sue on behalf of the working interest owners who did sustain the actual loss.[1]

***Response by St. Paul/Hollimon***.   St. Paul responds that all of Bay Rock's arguments under its subrogation issue ignore the basic premise that contractual subrogation is a question of law for

---

[1] In its initial briefing, Bay Rock asserts that St. Paul waived its right to recover in subrogation by failing to request or submit a jury question on subrogation.  In its reply brief, however, Bay Rock concedes that the right to subrogation is a matter of law to be determined by the trial court; therefore, this sub-issue is waived.

the trial court to determine, not a question of fact to be submitted to the jury. St. Paul asserts that Bay Rock's appellate argument "conflates and confuses" the proof relevant to a coverage action between an insurer and the insured (*i.e.*, whether the loss is a "covered loss" under the policy), with the proof necessary for a subrogated insurer to recover against the tortfeasor (*i.e.*, whether the elements of a tort claim are established). St. Paul further contends that none of Bay Rock's arguments are relevant inquiries because they arise out of equitable subrogation principles, and that once it satisfied the trial court that it had a contractual subrogation right it only had to prove up its negligence claim to the jury. As discussed below, the law supports St. Paul's position.

***The Nature of Subrogation.*** There are three types of subrogation—contractual, statutory, and equitable. *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648 (Tex. 2007). Caselaw most often discusses contractual or "conventional" subrogation and equitable subrogation. *See Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007); *see also Hartnett,* 870 S.W.2d at 167 n.7 (a right to subrogation may arise either from an agreement between the parties, or in equity to prevent fraud or injustice). To prevail on a claim of equitable subrogation, a party must show it involuntarily paid a debt primarily owed by another which in equity should have been paid by the other party. *Mid-Continent Ins.*, 236 S.W.3d at 774; *Frymire Eng'g Co. v. Jomar Intern., Ltd.*, 259 S.W.3d 140, 142, 144-46 (Tex. 2008). Contractual subrogation, on the other hand, is "created by an agreement or contract that grants the right to pursue reimbursement from a third party in exchange for payment of a loss . . . ." *Mid-Continent Ins.*, 236 S.W.3d at 774; *Hartnett,* 870 S.W.2d at 167 n.7 (noting that contractual subrogation rights have been held valid and enforceable). Under both types of subrogation, **the insurer stands in the shoes of the insured**, and may assert only those

rights held by the insured against the third party, subject to any defenses of the third party against the insured. *Mid-Continent Ins.*, 236 S.W.3d at 774 (emphasis added).

In clarifying the differences between contractual and equitable subrogation in *Fortis*, the Texas Supreme Court recognized that while the two concepts rest on common principles and are related, they are separate and distinct rights independent of each other. *Fortis*, 234 S.W.3d at 648. The Court stressed that although the two rights are independent, that does not mean they are co-equal, noting that equitable doctrines must conform to contractual agreements, "not the other way around." *Id.* A contractual subrogation right arises directly from the parties' agreement, and does not derive its validity from principles of equity. *Id.* at 647. "The policy declares the parties' rights and obligations, which are not generally supplanted by court-fashioned equitable rules that might apply, as a default gap-filler, in the absence of a valid contract . . . . Contractual subrogation clauses express the parties' intent that reimbursement should be controlled by agreed contract terms rather than external rules imposed by the courts." *Id.* at 647-48 (also discussing *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 U.S. 356 (2006), in which the United States Supreme Court "refused to apply the 'made whole' doctrine, deeming the [insured's] equitable defenses 'beside the point' because [the insurer's] subrogation claims arose by written agreement"). "Where a valid contract prescribes particular remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy." *Fortis,* 234 S.W.3d at 648-49. It is well established that subrogation clauses do not violate Texas public policy, and there is no allegation here that the clause violates a particular law. *See id.* at 649. A contractual subrogation provision must be enforced as written, subject to general contract law principles of construction. *Id.* at 648 n.36, 650, 651 n.54 (court looks to the plain language of the subrogation provision which defines the parties'

rights and obligations, and construes it in relation to the entire instrument); *see Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

   ***Bay Rock's Arguments are Based on Equitable Principles.*** Despite its representations to the contrary, the basic premise of Bay Rock's position depends on equitable subrogation principles which it seeks to inject into this contractual subrogation case. In support of its primary contention that "[h]aving a right to subrogation . . . is distinct from the ability to recover under that right," Bay Rock quotes that statement from *Mid-Continent. See Mid-Continent*, 236 S.W.3d at 774. That case is distinguishable from this case in that it involved contribution among co-insurers. In *Mid-Continent*, two insurance companies separately provided primary insurance coverage to the same insured and cooperatively assumed the defense of the negligence suit against the insured. The suit was settled for $1,500,000, and, based on their divergent valuations of the case, one of the insurance companies paid a greatly disproportionate share of the settlement; it then sued its co-insurer for equitable contribution, and for reimbursement through subrogation to the rights of the insured. *Id.* at 769-71. Upon submission of certified questions from the Fifth Circuit, the Texas Supreme Court held that, due to the presence of "pro rata clauses" in the insurance policies, there was no equitable contribution claim against the underpaying co-insurer "because the clause makes the contracts several and independent of each other." *Id.* at 772-73. As to the contractual subrogation argument, the Court held that a fully-indemnified insured has no rights against a nonpaying co-insurer to which a paying co-insurer can be subrogated. *Id.* at 775-76. A concurring opinion was issued by one justice expressing the belief that the decision was a narrow one, confined to the particular factual circumstances presented. *Id.* at 777 (Willett, J., concurring).

Bay Rock also heavily relies on *Esparza v. Scott & White Health Plan*, 909 S.W.2d 548 (Tex. App.—Austin 1995, writ denied), *abrogated by Fortis Benefits v. Cantu*, 234 S.W.3d 642 (Tex. 2007), quoting it for the proposition that, "an insurance contract providing expressly for subrogation cannot answer the question of *when* the insurer is actually entitled to subrogation or *how much* it should receive." *Id.* at 551. The "when" and the "how much" are the two "elements" that Bay Rock contends St. Paul failed to prove here—even though its claim is one for contractual subrogation. While *Esparza* did involve a contractual subrogation claim, the Austin Court of Appeals applied equitable principles, specifically the "made-whole" doctrine, to trump the health insurer's contractual right to subrogation because the settlement received by the insured did not cover his medical expenses. *Id.* at 551-52. In abrogating *Esparza* and holding that the equitable "made-whole" doctrine did not apply to the insurer's contractual subrogation right, the Supreme Court explained that contractual subrogation rights are determined solely by the parties' agreement and equitable principles must yield to the express terms of the contract. *Fortis*, 234 S.W.3d at 647-49 (stating in part that equitable principles must conform to the contractual agreement, not vice versa). In *Fortis*, the Supreme Court rejected the idea that additional equitable elements must be met when a party has a contractual subrogation claim; rather, the right to recover is determined by the terms of the contract. *Id.* at 648-50.

***Application of Law to Facts: This Case Involves Contractual Subrogation***. Here, there is no dispute that St. Paul had a contractual subrogation right pursuant to its insurance policy with Hollimon; therefore, the express agreement of the parties controls, and equitable principles do not come into play. The subrogation clause in the Policy states in relevant part that,

> [t]he Company shall upon reimbursement hereunder to the Insured of any loss, damage or expense be subrogated to all the Insured's rights of recovery against any other person, firm or corporation who may be . . . liable for such loss, damage or expense so reimbursed by the Company.

The court must construe the contractual subrogation clause "as is," based on its plain language and within the context of the agreement as a whole, to determine the parties' intent. *Id.* at 650-51. Here, the contractual subrogation clause in the Policy is clear and unambiguous. Under *Fortis*, the additional elements of "how" and "when" St. Paul may recover on its contractual subrogation right are not required.[2] *Id.* at 648-50.

In its reply brief, Bay Rock also argues that St. Paul was required *by the express terms of the subrogation clause* to prove to the trial court that its settlement was payment of an insured loss under the Policy. Bay Rock points to the language in the "Receipt and Release Agreement," arguing that St. Paul never admitted its settlement payment was for an "insured" or "covered" loss under the Policy. We disagree such proof is required. The Policy states in part, "upon reimbursement hereunder to the Insured of **any** loss . . . [St. Paul is] subrogated to **all** the Insured's rights of recovery against any other person . . . who may be liable for such loss . . . ." [emphasis added]. Therefore, under the plain terms of the contract, St. Paul's right to subrogation arose upon the payment of any loss.

Furthermore, the "Receipt and Release" agreement signed by Hollimon and St. Paul recites that, "as a business consideration and without recognizing coverage, St. Paul previously advanced

---

[2] Within its subrogation issue, Bay Rock also asserts the trial court erred in excluding testimony that Hollimon did not have an equity interest in the well and did not suffer damages as a result of the blowout because any costs were passed on to the working interest owners. This evidence would be relevant under the subrogation issue only if it were necessary for St. Paul to prove additional elements establishing its ability to recover under its contractual subrogation right, a proposition we have rejected.

to Hollimon the sum of $2 million . . . which Hollimon accepted . . . *without waiving its claims* under the Policy." The agreement then states that it is agreed that Hollimon will retain the $2 million and St. Paul will pay the additional $857,788, in return for which "Hollimon acknowledges that the payments by St. Paul . . . are made in full and final settlement of all claims . . . which Hollimon may have against St. Paul arising out of the Loss and/or the Claim." Hollimon warrants in the agreement that "no other interest owner in the Well . . . has . . . or will have any rights, claims or interests under the Policy." Thus, the agreement makes clear that the total $2,857,788 paid by St. Paul was in settlement of any and all claims under the Policy for the "Loss," which is defined as the loss Hollimon sustained at its Striebeck No. 1 Well on or about August 5, 2003 for which it made a claim under the Policy, *i.e.*, the blowout. Accordingly, once St. Paul paid the money to Hollimon, it had a contractual right to "step into the shoes of" Hollimon and to initiate the suit against Bay Rock as subrogee of its insured, Hollimon. *See Hartnett*, 870 S.W.2d at 167 (under the unambiguous express terms of the insurance policy, insurer was entitled to recover "(to the extent of the payment by [insurer]) each and all claims and demands against any other party . . . arising from or connected with such loss and damage. . . .").

***Conclusion***.　Thus, under the law of subrogation discussed above, based on its contractual subrogation right, St. Paul stepped into the shoes of its insured, Hollimon, and obtained Hollimon's right to sue Bay Rock for negligently causing the blowout, subject to any defenses Bay Rock could assert against Hollimon. *See Mid-Continent Ins.*, 236 S.W.3d at 774. Therefore, St. Paul is correct that, upon convincing the trial court that it had a contractual subrogation right as a matter of law, it only had to prove the elements of its negligence claim to the jury. Bay Rock's first issue is overruled.

## NEGLIGENCE: PROXIMATE CAUSE

In its second issue, Bay Rock contends the evidence is legally and factually insufficient to support the jury's finding that Bay Rock's negligent acts or omissions proximately caused the well's blowout and resulting damages. As defined in the jury charge, "proximate cause" means:

> [A] cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred; and in order to be a proximate cause, the acts or omissions complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

The charge correctly defined proximate cause as incorporating two elements: foreseeability and cause in fact. *See Southwest Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 274 (Tex. 2002). The test for foreseeability within the context of proximate cause is whether a person of ordinary intelligence would have anticipated the danger his or her negligence created. *Id.* Cause in fact, or "but for" causation, is established by showing that the defendant's negligence was a substantial factor in bringing about the injury and without which no harm would have been incurred. *Id.* If the defendant's negligence merely furnished a condition that made the injury possible, there is no cause in fact. *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). Further, the two elements of proximate cause cannot be established by "mere conjecture, guess, or speculation." *Id.*

When reviewing the record to determine if there is legally sufficient evidence to support the jury's finding of causation, the court views the evidence in a light that tends to support the jury's finding of causation and disregards all evidence and inferences to the contrary. *Southwest Key*, 81 S.W.3d at 274. When conducting a factual sufficiency review, we consider and weigh all the evidence and set aside the verdict only if the jury's finding is so against the great weight and

preponderance of the evidence that it is clearly wrong and unjust. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761-62 (Tex. 2003); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The plaintiffs respond to Bay Rock's sufficiency challenge by arguing that the record contains ample evidence showing that a series of negligent acts and omissions by Bay Rock's drilling engineer, John MacDiarmid, and Bay Rock's company man on-site, Ted Reichert, proximately caused the blowout, and that any one of these acts or omissions is sufficient to support the jury's finding. Our discussion will focus on one negligent act and/or omission by MacDiarmid which the plaintiffs' drilling expert, Gary Wooley, testified was a substantial factor in causing the blowout and without which it would not have occurred.

### *Drilling Ahead Without a Formation Integrity Test at the Intermediate Casing Seat.*

Wooley's expert opinion was that the primary causal factor of the blowout was Bay Rock's negligent decision to drill ahead without running a true formation integrity test ("FIT"), also known as a "shoe test" or "casing seat test," to ensure that the intermediate casing seat and surrounding formation could withstand the anticipated higher pressures as they drilled further down-hole. Wooley testified that the decision to drill ahead without doing a proper FIT at the intermediate casing seat was the factor that set into motion the sequence of events that led directly to the blowout. Specifically, Wooley opined that the intermediate casing seat was unable to withstand the high pressure of the gas kick, resulting in an underground blowout, the loss of almost all the drilling mud in the hole, and the ultimate inability to control the well at the surface, resulting in the surface blowout and fire.

Wooley testified that the engineering decisions concerning the "design, supervision and drilling" of the Striebeck No. 1 Well ultimately rested with Bay Rock. John MacDiarmid was the

drilling engineer for Bay Rock on the well. MacDiarmid prepared the drilling program for the well and provided the plan to Bay Rock's on-site representative, "company man" Ted Reichert. MacDiarmid supervised Reichert throughout the drilling process, and Reichert reported to MacDiarmid at least daily and called MacDiarmid whenever he had questions. MacDiarmid and Reichert both testified that MacDiarmid had instructed Reichert to conduct a proper FIT, or casing seat test, like the one done at the surface, after the intermediate casing was set. Reichert admitted that he did not perform a casing seat test at that point in the drilling process, as instructed. Instead, after encountering a lost circulation weak zone at approximately 7,100 feet, Reichert performed a "squeeze job" by pumping liquid cement into the casing and the surrounding formation; then, Reichert ran liquid mud weighted to 14.2 pounds per gallon ("ppg") through the still-liquid cement, creating pressure at the site of the squeeze job. Reichert testified that he felt the pressure achieved on the squeeze job was sufficient to show the casing seat could withstand the higher pressures from drilling deeper, and he considered it an equivalent test to the FIT.

When Reichert informed MacDiarmid that he had not, in fact, performed the casing seat test requested by MacDiarmid, he had already continued drilling further down into the hole. Reichert testified that MacDiarmid was "not alarmed" by his failure to perform a FIT, and that MacDiarmid never mentioned stopping the drilling to conduct a proper FIT test at that time. MacDiarmid testified that when he learned that Reichert had not conducted a FIT, he believed it was "too late" because Reichert had already drilled ahead. MacDiarmid also stated he felt that Reichert had done an equivalent FIT test during the "squeeze job," and that the ability to continue drilling deeper confirmed that. MacDiarmid agreed that doing a casing seat test after setting casing is "good drilling

practice" and "standard industry practice," and confirmed that he had told Reichert to do the casing seat test.

The plaintiffs' expert, Gary Wooley, was very critical of MacDiarmid's ultimate decision to continue drilling ahead without conducting a proper FIT test, stating it was "not good drilling practice." Wooley testified that when MacDiarmid was informed that the FIT had not been done, it was *not* too late at that point to conduct a true FIT, and they should have stopped drilling and properly tested the casing seat to see if it could withstand the pressure of the 13.8 ppg drilling mud they expected to use to get to the bottom. Wooley explained that Reichert's "squeeze job" was a repair—which then needed to be tested—but was "not a test in itself" like a "shoe test" or casing seat test; he stated that the proper test was never done at the intermediate casing seat. Wooley further testified it is traditional drilling practice to perform a "shoe test" using the expected maximum mud weight to test the formation strength at the casing seat depth; in fact, the shoe test rating is so important that it is noted on each page of the daily drilling report for the well.[3] Wooley concluded the decision to continue drilling without the information gained from a shoe test at the intermediate casing seat was the "critical decision that set the table for the blowout." Wooley testified that by drilling ahead based solely on Reichert's "squeeze job," and without a proper FIT, they put the gas reserves at risk of an underground blowout. Further, Wooley testified that the fact that Reichert was able to drill ahead for another 1,200 feet before encountering a lost circulation problem was also not a "shoe test."

---

[3] The testimony established that MacDiarmid received each day's drilling report from Reichert, reviewed it, and then passed it on to Hollimon. On August 4 and 5, right before the blowout, the daily drilling report's box for a "shoe test" at the intermediate casing seat depth showed "none," which Reichert testified was correct. However, the report for the next day, August 6, showed an entry of "13.7 ppg" in the "shoe test" box; Reichert and MacDiarmid both testified they do not know how that number got there.

In addition, members of the Unison drilling crew testified on the issue. The toolpusher, Clement Wofford, testified that the industry's blowout prevention manual states the best way to eliminate a gas kick is through good planning, and, in Wofford's opinion, good planning includes doing a proper shoe test when you set the casing. The driller, Richard Arguello, testified it is standard practice to perform a shoe test after setting the intermediate casing; he did not remember if a shoe test was done on his shift. The derrick hand, Robert Almandariz, testified that Reichert did not instruct him to do a shoe test at the intermediate casing seat, but instead to drill ahead; he stated that it is standard procedure to do a shoe test when they set casing and they do it on every job. Finally, the mud engineer, Rick Goodman, testified that it was necessary, and standard practice, to do a shoe test after setting casing to test whether they could drill to the planned depth with the expected mud weight; he did not know whether a shoe test was performed.

Bay Rock's expert, Robert Grace, testified to his opinion that the ultimate cause of the surface blowout and fire was "equipment failure," and placed the blame on Unison Drilling for supplying faulty equipment, or failing to maintain its equipment. Specifically, Grace testified the equipment failure occurred at the closing unit, or accumulator, which controls the flow of hydraulic fluid that is used to close and hold shut the two blowout preventer components. Grace stated that the annular preventer failed first when its rubber bladder began leaking hydraulic fluid and then burst open; then, the hydraulic fluid leaking from the burst annular caused the second preventer component, the pipe rams, to fail because there was not enough pressure to hold them closed.

Further, Grace testified there are three ways to conduct a "shoe test" to determine whether the casing shoe or seat[4] will hold—including a "breakdown test." A "breakdown test" involves

---

[4] Grace explained that the casing shoe or seat is usually the weakest point in the formation.

drilling down and increasing pressure until the rock formation begins to take fluid or actually breaks, indicating it cannot withstand the pressure, and then doing a cement "squeeze job" to repair the break. Grace stated that Reichert essentially performed a "breakdown test" when he continued drilling out from the casing seat until he had "lost returns" in the form of lost liquid mud, which occurs when the formation breaks down; then, he did a cement "squeeze job" to repair the break. Contrary to Wooley's opinion, Grace stated that the failure to perform "an actual FIT test" did not cause or contribute to the blowout; instead, the blowout was caused by "equipment failure." Grace agreed, however, that "this well broke down underground in formation," and there was an underground blowout well before the equipment failed at the surface.

Bay Rock argues the evidence is insufficient to support the jury's proximate cause finding because, at most, there are equal inferences based on the two competing expert opinions as to why the blowout occurred, and therefore neither inference can be drawn. *See Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) ("equal inference" rule provides that when circumstances are consistent with either of two facts, and nothing shows that one is more probable than the other, neither fact can be inferred). However, that argument ignores the jury's role as the sole judge of the credibility of the expert witnesses, as well as of the lay witnesses, and fails to recognize that the jury was entitled to believe all, part, or none of each expert's testimony. *See Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 50 (Tex. App.—San Antonio 2006, no pet.). The mere fact that competing expert testimony was presented does not render the evidence insufficient to support the jury's verdict under the equal inference rule. *Id.*; *TXI Transp. Co. v. Hughes*, 224 S.W.3d 870, 911 (Tex. App.—Fort Worth 2007, pet. granted) (recognizing jury was entitled to determine weight and credibility of competing expert testimony as to how accident occurred, and concluding there was

legally and factually sufficient evidence to support jury's negligence finding). There was substantial evidence that it is safe, standard drilling practice to do a FIT when casing is set; it was undisputed that MacDiarmid instructed Reichert to do a FIT when the intermediate casing was set, but he did not do it; Wooley stated the "squeeze job" repair that Riechert performed was not the same as a FIT, and when MacDiarmid learned the FIT was not done it was not too late to stop drilling and perform a proper FIT, but MacDiarmid chose to continue drilling.

Based on our review of the trial record, we conclude there is both legally and factually sufficient evidence to support the jury's finding that a negligent act or omission by Bay Rock was a cause in fact of the blowout based on MacDiarmid's decision to continue drilling ahead without stopping to conduct a proper FIT. Accordingly, Bay Rock's sufficiency issues are overruled. We affirm the portion of the trial court's judgment finding Bay Rock liable for negligence.

### PRE-JUDGMENT INTEREST

In its third issue, Bay Rock asserts that St. Paul is not entitled to prejudgment interest because its suit was not for property damage; rather it was to recover its economic loss. This argument is based on the same premise as Bay Rock's first issue—that this is a subrogation case, not a negligence case. Statutory pre-judgment interest is authorized only in wrongful death, personal injury, and property damage cases. TEX. FIN. CODE ANN. § 304.102 (Vernon 2006); *see Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 530 (Tex. 1998) (stating that, for purposes of statutory prejudgment interest, the scope of "property damage cases" includes only claims for damage to tangible property, not economic loss). Thus, the resolution of this issue depends on the proper characterization of the plaintiffs' suit, specifically, whether the suit was for the recovery of property damage or for the recovery of economic loss resulting from the insurance

payment. In their fifth amended petition, the plaintiffs seek to recover damages arising from the blowout, including but not limited to "repair, completion and evaluation of the well, well control, lost gas sales and redrill of the well known as Dougherty Striebeck No. 1." Those types of damages are clearly property damages. *See Texon Drilling Co. v. Elliff*, 216 S.W.2d 824, 830 (Tex. Civ. App.—San Antonio 1948, writ ref'd n.r.e.).

The only place in the plaintiffs' petition that refers to St. Paul is one paragraph under the "Damages" section, which states,

> St. Paul, as subrogee, is the real party in interest with respect to part of the damages sought herein. In this regard, St. Paul seeks damages not in excess of $2,857,787.65, the amount it paid to its insured, Plaintiff/subrogor, Hollimon Oil Corporation and/or Working Interest Owner Plaintiffs. All damages sought in excess of $2,857,787.65 are being sought by Plaintiffs . . . [the four working interest owners] to the extent of their uninsured working interests in the well.

That provision merely states that out of any property damages awarded against Bay Rock, St. Paul is entitled to receive only the amount it paid to Hollimon, and the rest of the damages award is to be paid to the working interest owners. As discussed above, pursuant to the subrogation clause in the Policy, St. Paul "stepped into the shoes" of Hollimon as its insured and thus could bring the same claims against Bay Rock that Hollimon and the working interest owners could bring, *i.e.*, the negligence claim for property damage. Based on the type of damages awarded by the jury, consisting of the monetary costs to control, repair, and complete the Striebeck No. 1 well plus the value of the lost gas, the award of prejudgment interest on the judgment is proper.

## II. CROSS-APPEAL

In a cross-appeal, St. Paul, Hollimon, and the four individual working interest owners argue the trial court erred in rendering a final judgment that failed to hold Bay Rock liable for all the

damages found by the jury. The plaintiffs assert the court: (1) improperly applied Chapter 33 of the Texas Civil Practice and Remedies Code (the "Code"); and (2) erred by disregarding the jury's award of lost gas damages to the working interest owners. We will begin by addressing the trial court's claimed errors under the Code.

## CHAPTER 33 OF THE CIVIL PRACTICE & REMEDIES CODE

Question No. 2 in the jury charge asked the jury to determine what percentage of negligence that caused the occurrence was attributable to Hollimon, Bay Rock, and responsible third party Unison Drilling. The jury answered as follows: Hollimon 0%; Bay Rock 51%; and Unison Drilling 49%. The jury then awarded total damages in the amount of $4,527,536.00. After disregarding $1,000,000 awarded for lost gas, which will be more fully discussed below, the trial court entered a final judgment for $1,799,012.70, reflecting a reduction of the overall damages by 49%, the amount of responsibility assigned to Unison.

In their first two issues on cross-appeal, the plaintiffs argue the trial court erred in calculating damages either by (1) improperly applying section 33.012 of the Code to reduce the plaintiffs' damages by 49%, the percentage of negligence assigned by the jury to Unison, or (2) failing to properly apply joint and several liability to Bay Rock under section 33.013 of the Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.012-.013 (Vernon 2008). In response, Bay Rock disagrees that the trial court reduced the judgment by 49%. Instead, Bay Rock asserts the trial court correctly applied section 33.013(a) of the Code in limiting the amount of Bay Rock's liability to the percentage of damages equal to its percentage of responsibility as found by the jury (51%). Because our analysis of section 33.013 is dispositive of this issue, we do not address the plaintiffs' arguments relative to section 33.012.

The primary objective in construing any statute is to determine and give effect to the legislature's intent. *Warner v. Glass,* 135 S.W.3d 681, 683 (Tex. 2004). A court begins with the plain and common meaning of the statute's words. TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 2005) ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage"). When construing a statute, "we read every word, phrase, and expression . . . as if it were deliberately chosen . . . ." *Cordillera Ranch, Ltd. v. Kendall County Appraisal Dist.*, 136 S.W.3d 249, 254 (Tex. App.—San Antonio 2004, no pet.). "If the meaning of the statutory language is unambiguous, we adopt . . . the interpretation supported by the plain meaning of the provision's words and terms." *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex. 1999). Extrinsic evidence of legislative intent is not analyzed if intent is apparent from the language of the statute. *See id.* at 866 ("when we stray from the plain language of a statute, we risk encroaching on the Legislature's function to decide what the law should be"); *see also Minton v. Frank,* 545 S.W.2d 442, 445 (Tex. 1976).

> Turning to the statute at issue, section 33.013 reads in relevant part:
>
> (a) Except as provided in Subsection (b), a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.
>
> (b) Notwithstanding Subsection (a), each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if:
>
>> (1) the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent[.]

TEX. CIV. PRAC. & REM. CODE ANN. § 33.013 (a), (b)(1) (Vernon 2008).

The plaintiffs argue that under a plain reading of the statute a defendant is liable for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility. *Id.* § 33.013(a). Additionally, in those instances where the defendant is assessed more than 50% of the responsibility, the defendant becomes jointly and severally liable for all recoverable damages. *Id.* § 33.013(b)(1). Accordingly, because the jury attributed 51% responsibility to Bay Rock, Bay Rock should have been assessed joint and several liability for all of the damages awarded to the plaintiffs.

Bay Rock counters that section 33.013(b)(1) cannot apply in a single-defendant case because, based on a literal application, there can be no joint and several liability when there is only one defending party. Bay Rock contends that in a single-defendant case, regardless of the percentage of responsibility assigned, the defendant is responsible only for the percentage of damages equal to its percentage of responsibility pursuant to section 33.013(a). Therefore, Bay Rock argues the trial court did not err in disregarding 49% of the damages, and thus limiting Bay Rock's liability to 51% of the total damages awarded. We respectfully disagree with Bay Rock's reading of the statute.

First, we observe that nothing in the statute or case law supports Bay Rock's claimed exception for single-defendant cases. Furthermore, Bay Rock's interpretation would require us to completely ignore the plain wording of subsection 33.013(b) which states, "**each** liable defendant is, **in addition** to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant . . . ." *Id.* (emphasis added). Moreover, we are not persuaded by Bay Rock's argument that it is unfair for it to be held jointly and severally liable for all damages when

another person has been assigned a percentage of responsibility,[5] especially in those instances where, as here, the defendant is precluded from seeking contribution from the responsible third party. This policy argument is one for the legislature's consideration. In our role as an appellate court we are guided by the language of the statute. In this case, the plain language of section 33.013(b)(1) simply does not make the application of joint and several liability dependent upon whether or not another person, such as a responsible third party, can or will ultimately pay for its share of responsibility; the only requirement is that the liable defendant meets the threshold percentage of fault. *Id*. If the threshold is met, a liable defendant bears not only its proportionate responsibility under section 33.013(a), but also assumes joint and several liability for all recoverable damages under section 33.013(b)(1). Accordingly, the assignment of 49% responsibility to Unison does not change or limit Bay Rock's joint and several liability which, pursuant to section 33.013(b)(1), flows from the jury's assessment that Bay Rock bore 51% of the overall responsibility. Finally, we note that, mathematically, only one person can be greater than 50% responsible; therefore, at most, only one defendant can ever be jointly and severally liable under the statute. *Id.* For the reasons stated *supra*, we hold the trial court erred when it failed to find Bay Rock jointly and severally liable for all recoverable damages. The plaintiffs' first issue on cross-appeal is sustained. We reverse the trial court's judgment limiting the amount of Bay Rock's liability to 51% of the recoverable damages.

## LOST GAS DAMAGES

---

[5] Under section 33.003, if sufficient evidence supports the submission, multiple persons can be submitted to the trier of fact for a determination of percentage of responsibility—each claimant, each defendant, each settling person, and each properly designated responsible third party. TEX. CIV. PRAC. & REM. CODE ANN. § 33.003 (Vernon 2008).

In their next issue on cross-appeal, the plaintiffs argue that the trial court erred post-verdict by granting Bay Rock's motion for judgment n.o.v. and disregarding the jury's $1 million dollar lost gas award. The plaintiffs contend the trial court should have rendered judgment in favor of the four working interest owners to the extent of their aggregate 35% ownership interest. To support their argument, plaintiffs assert: (1) competent evidence supported an award to the working interest owners because the plaintiffs collectively sought one recovery of damages through Hollimon as their representative; (2) apportionment of damages between the plaintiffs was not a controlling issue; and (3) Bay Rock failed to object or tender an alternative jury charge when the trial court decided to submit a general damages question under Hollimon's name. Bay Rock counters that the trial court correctly disregarded the lost gas damages because the only jury issue on this damages finding was restricted to Hollimon, and, as a matter of law, the well operator Hollimon itself sustained no injury.

Rulings on motions for judgment notwithstanding the verdict are reviewed under the same legal sufficiency standard as no-evidence challenges to the sufficiency of the evidence. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). In order to uphold a trial court's decision to disregard a jury's findings and grant a judgment notwithstanding the verdict, an appellate court must find that no evidence supports the jury's findings. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990). If more than a scintilla of evidence supports the jury's findings, the jury's verdict and not the trial court's judgment must be upheld. *Id.* at 228.

***Damages Question***. Plaintiffs argue that liability and total damages were the only controlling fact issues to be determined by the jury, and both were properly submitted in the jury charge. As to liability, Question No. 1 inquired whether Bay Rock's negligence proximately caused the blowout, and Question No. 2 asked the jury to determine the percentage of Bay Rock's negligence. As to

damages, Question No. 3 asked about the total amount of damages in each of four categories of costs caused by the blowout, reserving the apportionment of damages among the plaintiffs for the trial court to determine post-verdict. Question No. 3 on damages reads in pertinent part as follows:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Hollimon Oil Corporation for its damages, if any, that resulted from the occurrence in question?
>
> . . .
>
> a. Cost to control the Striebeck No. 1 well.
>    Answer: $1,527,476.00
>
> b. Cost to repair, complete and evaluate the Striebeck No. 1 well.
>    Answer: $2,000,000.00
>
> c. Cost of lost gas in the Striebeck No. 1 well.
>    Answer: $1,000,000.00
>
> d. Cost to redrill the Dougherty-Striebeck well.
>    Answer: $00.00

**_Trial Record._** The jury heard evidence at trial that under the Joint Operating Agreement, Hollimon as the operator was vested with broad authority over well-related operations. Hollimon was contractually responsible for retaining Bay Rock, making insurance claims, and charging the working interest owners' joint account for costs and legal expenses necessary to repair, replace, or restore all damages to the joint property. Additionally, the jury heard evidence that Hollimon was the representative plaintiff for the working interest owners[6] and that all plaintiffs were collectively

---

[6] Charles Hollimon, the President of Hollimon Oil Corporation and the corporate representative of Hollimon at trial, answered the following question during trial:

> Q: Hollimon Oil Corporation represents the investors in the well in this lawsuit; is that fair?
> A: Yes.

relying on the same experts for testimony regarding the total damages caused by the blowout. The plaintiffs' expert, Gary Wooley, testified that Hollimon was "the fellow in charge," at least as to the working interest owners, but could not itself retain any damages, if awarded, because Hollimon was contractually obligated under the Joint Operating Agreement to distribute any damages to the interest owners. At the time of trial, only four of the working interest owners, Feliciana Corporation, Duncan Underwood, Everett Desha, and Seeligson Oil Company, were parties in the suit against Bay Rock, seeking reimbursement of their uninsured blowout damages in the amount of their collective 35% working interest.

The record further confirms that on at least two occasions during trial, the trial court stated its intent to submit a general damages question for the total (100%) amount of damages, and then allocate any award among the various plaintiffs after the verdict. Counsel for both sides participated in the discussions; no objections were lodged. Before Wooley's testimony, the following exchange with the trial court occurred outside the presence of the jury:

> **Counsel for Bay Rock**: We're rapidly approaching this point in the trial, and I think you said you were going to tell us how you were going to handle it. If you will recall, the damage expert that's going to be testifying in this, six point some odd million dollars, of which only they get 35 percent of, are you going to want me to cross-examine their expert over that, or are you going to take care of that as a legal afterwards?
>
> **Counsel for St. Paul**: May I say something on that? We're asking for 100 percent up to the amount subrogated to, which is roughly 2.8. Over that amount, it's 35 percent, because those are the only ones participating.
>
> **Court**: Why don't we just give the general issue to the jury, then the lawyers and I can work out the percentages afterwards, of the subrogation afterwards.

The next day, the court again stated, "[n]ow our discussion yesterday was that this jury would be given the amount of damages for 100 percent and then—we would then, after the jury was

discharged, we would consider the percentage that should be allocated to the various Plaintiffs." Consistent with this discussion, the trial court subsequently refused to allow questioning at trial regarding apportionment of damages among the plaintiffs.

The record further confirms that the plaintiffs submitted their requested jury charge using the generic term "plaintiffs," but the court's final jury charge substituted "Hollimon Oil Corporation" for "plaintiffs" in the damages question. Neither side objected to that reference in Question No. 3 before the charge was read to the jury.[7]

***Discussion***. We agree with the plaintiffs that, based on the record before us, apportionment of the blowout damages among the plaintiffs was not a controlling issue. Uncontroverted questions of fact and uncontroverted issues need not be, and should not be, submitted to the jury for determination. *City of Keller*, 168 S.W.3d at 815 n.52. In the instant case, apportionment of the total damages among the plaintiffs could be determined as a matter of law by the court post-verdict, based on the subrogation claims of St. Paul and the respective ownership interests of the four individual plaintiffs; therefore, it was not necessary to list the names of the four working interest owners in Question No. 3. *Id.*

Furthermore, we do not agree with Bay Rock that the trial court could not render judgment on the jury's answers to Question No. 3 because the names of the interest owners did not appear in the damages question. Bay Rock relies on *W & F Transp., Inc. v. Wilhelm,* 208 S.W.3d 32 (Tex. App.—Houston [14th Dist.] 2006, no pet.). *W & F Transportation* is inapposite to the instant case

---

[7] The plaintiffs assert that they assumed the trial court chose to insert Hollimon as the representative plaintiff based on the trial evidence that Hollimon was presenting the case for all the plaintiffs, and that the court would apportion damages later according to the individual interests. The plaintiffs argue that Bay Rock's counsel apparently had the same understanding because immediately after the verdict counsel for Bay Rock noted that he would be requesting a reduction of the lost gas award to "less than 35 percent because you have to take out the royalty interest owner share, too, but I will present that number to [counsel for St. Paul]. If we can't agree on it, we'll bring it back before the court."

because it involved whether an individual defendant was found liable when only the corporate defendant was named in the liability question submitted to the jury. *See id*. at 44-47. Liability is a controlling issue, and in order to establish liability the party seeking the liability finding must submit a jury question as to each defendant. *Id.* at 45. By contrast, the *portion* of total damages to be awarded to each individual plaintiff based on uncontroverted facts is not a controlling issue that must be determined by the jury; further, only the plaintiffs, not the defendant, would have a reason to complain about the apportionment between them. *See, e.g., Corporate Wings, Inc. v. King*, 767 S.W.2d 485, 490 (Tex. App.—Dallas 1989, no writ) (only plaintiffs, not defendant, may complain about apportionment of exemplary damages between co-plaintiffs); *Garvin v. Goldsmith,* 406 S.W.2d 545, 547-48 (Tex. App.—Waco 1966, writ ref'd n.r.e) (plaintiff and intervenors who pleaded and proved action in concert were only ones who could complain of apportionment of lump-sum awarded). Here, the jury resolved the controlling issues by making a finding of liability against Bay Rock predicated on negligence, and assessed damages against Bay Rock for its negligence. As discussed *supra*, apportionment of the total damages among the plaintiffs need not be submitted to the jury when, as here, the court submits a general damages question that results in a lump-sum award capable of being apportioned by the court based on undisputed ownership interests. *See City of Keller,* 168 S.W.3d at 815 n.52.

Even if we were to agree with Bay Rock that the failure to include the names of the individual interest owners rendered the question defective, Bay Rock did not object to the submission of Question No. 3. Rule 274 of the Texas Rules of Civil Procedure applies when a question is submitted in a defective form. *See Allen v. Am. Nat'l Ins. Co.,* 380 S.W.2d 604, 609 (Tex. 1964). Rule 274 provides, in relevant part, that:

A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.

TEX. R. CIV. P. 274. Because Bay Rock did not object to the omission of the interest owners' names from the damages question, it has waived the right to complain about such alleged error. *Id.*; s*ee also Am. Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex. 1990) (defendant waived right to complain of jury's exemplary damage award because it agreed to defective jury question allowing finding of tort damages under other theories to serve as basis of award).

Bay Rock argues that at the time of submission it had no reason to object to the wording of Question No. 3 and its accompanying instructions. Bay Rock contends the literal wording of the question and its accompanying instructions restrict the inquiry specifically and singularly to Hollimon as opposed to the non-operators now alleged to have been "represented" by Hollimon. Indeed, instead of seeking damages claimed by *all* plaintiffs, Question No. 3 speaks only about Hollimon's damages and is conditionally submitted based on the *conduct* of Hollimon. Therefore, Bay Rock asserts it properly preserved a no-evidence complaint through its motion for judgment notwithstanding the verdict. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 220-21 (Tex. 1992). Furthermore, Bay Rock maintains that during post-trial hearings the court confirmed

that Question No. 3 was not meant to use Hollimon in a representative capacity for the working interest owners.[8] We disagree.

"Error in the jury charge is reversible only if, in the light of the entire record, it was reasonably calculated to and probably did cause the rendition of an improper judgment." *Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex. 1995). Viewing the record as a whole, including the court's rulings and comments made both during and after trial,[9] it is apparent that at the time the court submitted Question No. 3 it intended to use Hollimon's name generically to represent the interests of *all* plaintiffs, with the intent to apportion damages after the verdict—taking into consideration both St. Paul's subrogation interest and the respective ownership interests of the four individual plaintiffs. Bay Rock's trial counsel was present and aware of the trial court's comments and rulings on this issue. Therefore, it was incumbent on Bay Rock to object to the claimed defect at the time of submission or risk waiving its right to later complain on appeal. *Allen,* 380 S.W.2d at 609.

Because there is substantial evidence in this record supporting the jury's award of lost gas damages to the four working interest owners, the trial court erred in granting Bay Rock's motion for judgment notwithstanding the verdict, disregarding the jury's lost gas award, and failing to enter judgment for the lost gas damages for the interest owners. *Mancorp,* 802 S.W.2d at 227. Accordingly, we reverse the trial court's entry of judgment notwithstanding the verdict and render judgment upholding the jury's verdict as to the lost gas damages.

---

[8] Two months after the jury verdict, during a hearing on the Motion to Enter Judgment, the trial court stated, ". . . my reading of the pleadings and of the documents in evidence, that the only recovery of lost gas is to the working interest owners . . . And the reason for disregarding that element in the damages recovered by Hollimon Oil Corporation was that the proper parties were not named to recover the [ ] lost gas. And hindsight is 20/20. There should have been a separate issue addressing the damages recovered by the working interest owners."

[9] At the first post-trial hearing, the court admitted it could not remember what the agreement was at trial regarding the lost gas damages submission.

CONCLUSION

Based on the foregoing analysis, we conclude the trial court's judgment should be affirmed in part, reversed and rendered in part, and reversed and remanded in part, as follows:

1.  We affirm the portion of the trial court's judgment finding liability against Bay Rock Operating Company;

2.  We reverse the trial court's ruling limiting Bay Rock's liability to 51% of the total damages, and render judgment that Bay Rock is jointly and severally liable for all of the recoverable damages by the plaintiffs; accordingly, we reform the portion of the trial court's judgment awarding damages in favor of Hollimon Oil Corporation and subrogee/real party in interest, St. Paul Surplus Lines Insurance Company from $1,799,012.70 to $2,857,787.00, and affirm that portion of the judgment as reformed;

3.  We reverse the trial court's ruling granting judgment notwithstanding the verdict as to the lost gas damages, and render judgment in favor of Feliciana Corporation, Duncan Underwood, Everett Desha, and Seeligson Oil Company, Ltd. for 35% of the lost gas damages of $1,000,000.00, or $350,000.00, and for 35% of the $669,749.00 in uninsured damages remaining after St. Paul's subrogated amount is deducted, or $234,412.00;

4.  We remand the cause of action to the trial court for the proper apportionment of the total recoverable damages among Feliciana Corporation, Duncan Underwood, Everett Desha, and Seeligson Oil Company, Ltd. based on their percentage ownership interests, and taking into account any royalty interests; and

5.  We affirm the portion of the trial court's judgment awarding the plaintiffs prejudgment interest on the total damages assessed against Bay Rock at the rate of 7.50%, with such interest accruing on March 1, 2005, the date the suit was filed, through December 17, 2007.


Phylis J. Speedlin, Justice