**Dr. Ross WEBSTER, Appellant,**

v.

**Donna Kay JOHNSON, Appellee.**

No. 01–86–0237–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 31, 1987.

John Marshall, Ryan & Marshall, Houston, for relator-appellant.

John M. O'Quinn, John M. O'Quinn & Associates, Houston, for respondent-appellee.

Before HOYT, WARREN and DUNN, JJ.

## OPINION

HOYT, Justice.

This is an appeal from a judgment based on a jury award of $1,223,371 in a medical malpractice case. The jury found that appellant, Dr. Ross Webster, was negligent and that his negligence was a proximate cause of appellee's, Donna Kay Johnson's, damages.

In June 1979, Johnson visited Dr. Webster seeking a surgical solution to her obesity. Dr. Webster recommended a procedure called the "gastric wrap." The procedure called for wrapping the stomach around itself and then wrapping the stomach with a tube and a plastic sheet to maintain the stomach's new shape. Generally, this procedure requires the surgeon to also perform fundoplication; i.e., wrap a portion of the stomach around the esophagus to prevent food from being pushed back up the esophagus because, in its new shape, the stomach is smaller.

After Dr. Webster explained the surgery and possible complications to Johnson, she consented to the process. Surgery was

performed on July 2, 1979, by utilizing Marlex, a plastic mesh, as the wrapping material. Subsequently, Johnson developed a pulmonary embolism, which was treated successfully.

On July 15, Johnson developed a fever, and on July 24, Dr. Webster diagnosed her condition as an abscess located under her left diaphragm in her chest cavity. A procedure was used to correct this problem, and Johnson was discharged from the hospital. On September 26, Johnson was readmitted because the abscess was not draining properly. Dr. Webster performed a rib resection to create a large cavity enabling the abscess to drain more freely. On that visit, a fistula or hole, was detected in Johnson's stomach. However, no corrective measures were taken, and Johnson was discharged on September 26. Johnson continued to visit Dr. Webster in his office every third day until November 16.

On November 17, Johnson was again admitted to Hermann Hospital but on this occasion, Dr. MacFayden began treating her. Johnson's diagnosis indicated that she was dehydrated, septic, malnourished, and displayed signs of infection. Dr. MacFayden's treatment included removal of the Marlex, draining the infection, and repairing the hole in Johnson's stomach. Johnson was discharged on January 10, 1980.

In August, Johnson returned to Dr. MacFayden because the area around the drainage incision had not healed, and a hernia had developed. Another surgery was performed, and she was again discharged. Johnson continued to have difficulty with infection and drainage until April 1985, when she finally healed.

In three points of error, Dr. Webster contends that: (1) there was legally insufficient evidence to support the jury's response to special issue No. 1; (2) the jury's damage finding to special issue No. 6 was manifestly excessive and a remittitur was proper; and (3) the trial court erred in failing to apply statutory law to reduce the damage award.

In his first point of error, Dr. Webster argues that the evidence was legally insuf-ficient to establish an element of Johnson's cause of action, i.e., the standard of care in like or similar cases. In reviewing legal insufficiency points or "no evidence" points, we must consider only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences that may properly be drawn from that evidence, and disregarding all contrary or conflicting evidence. *King v. Bauer,* 688 S.W.2d 845 (Tex.1985); *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965). A "no evidence" point must be sustained if we find a complete absence of evidence of probative force or only a scintilla of evidence to support the finding, or if the evidence tending to support the finding must be disregarded because it is legally incompetent. If there is more than a scintilla of probative evidence to support the finding, the point must be overruled. *Texaco v. Pennzoil,* 729 S.W.2d 768, 787 (Tex.App.—Houston [1st Dist.] 1987, writ pending); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Texas L.Rev. 361 (1960).

Whether the evidence was sufficient to meet each of the constituent elements of the "standard of care" is a question of law. We understand the standard of care to be "what a reasonable and prudent doctor would have done under the same or similar circumstances." *Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977) (citing *Snow v. Bond,* 438 S.W.2d 549, 550 (Tex.1969)). The burden is on the patient to show that the physician "has undertaken a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances. The circumstances to be considered include, ... (1) the expertise of and means available to the physician, (2) the health of the patient, and (3) the state of medical knowledge." *Hood,* 554 S.W.2d at 165.

Johnson's pleading asserted negligence by Dr. Webster in the operation procedure and in post-operative treatment. Although

these assertions of wrongdoing are independent claims, the issue of negligence was submitted to the jury "globally" by inquiring in question one: "On the occasion in question, was Dr. Webster negligent?" The jury then answered in the affirmative. Because the question of Dr. Webster's negligence was submitted "globally" and because Dr. Webster does not challenge the question of post-operative negligent treatment, Johnson may sustain the verdict if negligence is proved in either. *See Rosow v. City of San Antonio*, 734 S.W.2d 659 (Tex.1987) (defendant's failure to challenge that portion of the judgment based upon a civil rights claim under 42 U.S.C. § 1983 required that the judgment stand.)

▪ In order to sustain Dr. Webster's point of error, we must find that his conduct did not fall below the "reasonable and prudent doctor" standard in either operative care or post-operative care. *Beal v. Hamilton*, 712 S.W.2d 873 (Tex.App.— Houston [1st Dist.] 1986, no writ). Contrary to the urging of Johnson, it is not enough to show that Dr. Webster's operative or post-operative procedure was not compatible with that utilized by other doctors in Harris County. *Hood*, 554 S.W.2d at 165. Something more is required. Johnson must show either that the operative or post-operative procedure used by Dr. Webster constituted negligence and that a reasonable and prudent doctor would not have utilized the same operative procedure or post-operative treatment. *Id.*

Dr. MacFayden, testifying on behalf of Johnson, stated that he was familiar with the standard of care used in the treatment of obesity in Harris County and that since 1979, only the stapling procedure was used. He testified that the procedure used by Dr. Webster was not compatible with the standard of care in this area and that most of the post-operative treatment that he provided was required because of the operation performed. He further testified that in his medical opinion, the Marlex mesh should have been removed earlier and that a reasonable and prudent doctor would have prescribed an adequate protein diet. He testified that Johnson was severely malnourished when she came to him, and that he was required to administer nutrition for several weeks before removing the Marlex because she was not strong enough to endure the surgery. He concluded that reasonable care would have included serious consideration of "hyperalimentation" because no vitamins and little food was being maintained in Johnson's system.

Dr. Webster, testifying on his own behalf, admitted that Johnson developed an infection that involved the Marlex mesh and that the infection was present in September 1979, when he treated her for an abscess. His testimony did not indicate that he informed Johnson of the complications resulting from the infection. He admitted, however, that Johnson continued to have difficulty keeping food and vitamins down to the point that he decided to refer her to Dr. MacFayden. He testified that a portion of the food that did stay down passed through the fistula (hole) in her stomach. Dr. Webster disputed the assertion that he referred Johnson to Dr. MacFayden for treatment of the infection and fistula, but instead contends that he referred her for treatment of the development of a tear in her esophagus that allowed air to escape into her chest cavity.

▪ We agree with Dr. Webster's contention that Johnson failed to establish that his operative treatment was outside of what a reasonable and prudent doctor would have provided. However, that is only one aspect of Johnson's cause of action. The jury could have found that Dr. Webster did not act reasonably or prudently when he failed to remove the Marlex mesh earlier and when he failed to provide adequate nutritional care to avoid malnutrition. Additionally, the jury could have been persuaded and could have found that the course of treatment undertaken by Dr. Webster would not have been undertaken by another member of the medical profession, and that the course of treatment was unreasonable and imprudent under the circumstances.

Dr. Webster's expert witness testified that in the three cases that he could recall where infection occurred, in two cases the Marlex mesh was removed within two weeks, and in the third case it was not removed for four weeks, but only because the patient was informed and consented to the extended period. The jury, reviewing this evidence, could conclude that Dr. Webster was negligent, because he failed to follow the course of treatment that his own expert testified is medically prudent, i.e., removing the Marlex mesh sooner.

While there is no evidence indicating that Dr. Webster did not inform Johnson of the infection, there is an abundance of evidence indicating that Dr. Webster failed to properly monitor Johnson's condition following his discovery of the infection. This aspect of Johnson's case, lack of post-operative care, is virtually unchallenged by Dr. Webster on appeal.

There is more than a scintilla of evidence to support these findings, and based on the manner of submission, submitting a general liability issue, we hold that the evidence was legally sufficient to sustain the jury's response. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400 (Tex.1981). We overrule point of error one.

Dr. Webster contends in his second point of error that the jury's damage finding of $1,223,371 is "manifestly excessive" and that the trial court erred in overruling his motion for remittitur. Dr. Webster further contends that the evidence is legally and factually insufficient to support this finding. We note that in a single damage issue, Johnson sought a lump sum award for past and future medical expenses, past and future pain and suffering, past and future mental anguish, loss of past earnings, and loss of future earning capacity, and that no objection to this manner of submission was raised at trial or on appeal.

In determining whether the court erred in overruling Dr. Webster's motion for remittitur, we must consider whether the evidence is sufficient to sustain the award. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640

(Tex.1987); *Pope v. Moore,* 711 S.W.2d 622 (Tex.1986).

In reviewing factual insufficiency points, we must consider all of the evidence in the record that is relevant to the fact finding being challenged. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). We must order a remittitur if we determine that the damage award is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *Pope,* 711 S.W.2d 622.

We have previously enunciated, in the discussion of point of error one, the standard of review for the determination of a challenge to the legal sufficiency of the evidence.

■ The record reflects evidence of Johnson's pain, suffering, and mental anguish. She began experiencing continuous pain in her left rib area approximately 10 days after the gastric wrap was performed. She regularly vomited vitamins, food, and drinks, and endured the intense odor of the fistula draining from the incision in her abdomen. During a trip to visit her brother in November 1979, Johnson became very weak and required assistance from her mother and husband when she dressed or used the toilet. On one occasion, she lost consciousness in the bathroom, and when she awoke, she was in her brother's bed, and blood was escaping from the surgical incision. Immediately thereafter, she returned home and was admitted to Hermann Hospital in a dehydrated, malnourished, septic condition, and placed under the care of Dr. MacFayden. She then underwent surgery in December 1979, August 1980, and March 1985, to correct complications arising from the gastric wrap.

During this period, Johnson withdrew from her family and became alienated from her first husband because of the scars resulting from the surgery. She sought and received treatment for acute depression in 1980.

Evidence reflecting Johnson's loss of earning capacity is also present in the

record. In February 1980, she lost her job at a chicken processing plant because her employer did not want her working around food with an open wound. Subsequently, she quit her job at an ice cream store because she was in too much pain. She attempted to work at a child daycare center and quit because she could not lift children. Finally, she left her employment with a fried chicken restaurant because of the pain she was experiencing and because she and her husband did not feel that she was in any condition to work.

The record reflects testimony establishing past medical expenses of approximately $200,000. Although Dr. Webster claims that Johnson incurred some of this surgical expense from other unrelated medical treatment, no error is shown because the record does not reflect that the jury included those amounts for this unrelated treatment in its lump sum award. Dr. MacFayden also testified that Johnson's fistula abscess had healed but that she may incur medical expenses in the future for the correction of intestinal blockages. This is legally and factually sufficient evidence upon which a jury could have awarded past and future medical expenses. *Brown v. Friedman*, 451 S.W.2d 588 (Tex.Civ.App.—Houston [1st Dist.] 1970, no writ).

We are precluded by the form of the damage issue from knowing the amount awarded for each element of damage. However, after considering the evidence presented on each element of damage, we find that the court did not err in overruling Dr. Webster's motion for remittitur because the evidence was both legally and factually sufficient to support the jury's finding.

Dr. Webster's second point of error is overruled.

■ In his third point of error, Dr. Webster contends that the court erred because it did not limit his liability to $500,000 as required by Tex.Rev.Civ.Stat.Ann. art. 4590i, § 11.02(a) (Vernon Supp.1987).

We note that the limit of liability contained in § 11.02(a) is an affirmative de-

fense that must be pled in accordance with Tex.R.Civ.P. 94. *Tsai v. Wells*, 725 S.W.2d 271 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.); *Ingraham v. United States*, 808 F.2d 1075 (5th Cir.1987). Because this defense was not affirmatively pled, nothing is preserved for review.

Dr. Webster's third point of error is overruled.

The judgment is affirmed.

DUNN, Justice, dissenting.

I agree with the majority that the appellee failed to establish that the appellant's operative treatment was outside of what a reasonable and prudent doctor would have provided. However, I disagree with the majority's holding that the appellant "did not act reasonably or prudently in failing to remove the Marlex mesh earlier and in failing to provide adequate nutritional care to avoid malnutrition." The reason for my disagreement is that the appellee failed to establish the medical standard of care.

In Texas, it is well settled that a patient has no cause of action against his doctor for malpractice, either in diagnosis or in recognized treatment, unless he proves by a doctor of the same school of practice as the defendant that the diagnosis or treatment complained of was such as to constitute negligence and that it was a proximate cause of the patient's injuries ... [T]he testifying expert cannot establish the standard by stating what *he* would have done and what *he* thought was a proper use of the diagnostic tools available to Dr. Westbrook (the defendant) in examining the plaintiff.

*Stanton v. Westbrook*, 598 S.W.2d 331, 333 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); *see also Martin v. Petta*, 694 S.W.2d 233, 238 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.); *Coan v. Winters*, 646 S.W.2d 655, 657–58 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.).

Likewise, the witness' personal preference for treatment does not establish a standard of care. *Smith v. Guthrie*, 557

S.W.2d 163, 167 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n.r.e.). The testifying expert cannot establish medical standards of care by testifying as to what he would have done. *Hersh v. Hendley*, 626 S.W.2d 151, 159 (Tex.Civ.App.—Fort Worth 1981, no writ).

In the case before us, with respect to the removal of the Marlex, Dr. MacFadyen testified as follows:

(Plaintiff's Counsel): Do you have an opinion, Doctor, then, based on what you have told us whether or not on or about September 10th, at the time that the resection work was done, that you would have considered removing the Marlex mesh?

(Dr. MacFadyen): I—

(Plaintiff's Counsel): Consistent with the standard of care in Harris County, Texas?

(Dr. MacFadyen): I think that would have been *my personal preference* to have removed the Marlex at that particular time.

(Emphasis added.) Similarly, with respect to the appellee's nutritional care, Dr. MacFadyen testified as follows:

(Plaintiff's Counsel): Doctor, I want you to assume in that regard that Dr. Webster told Mrs. Zabodyn, even after this November or—let me get the chart here—September 10th admission, the point where you said earlier in your testimony that you would have considered taking some action. I want you to assume from that point forward that all Dr. Webster told her, and despite—you see the other indications here as to the subphrenic abscess—told her to just eat what she wanted and take some vitamins, but that she vomited up the vitamins and she told Dr. Webster this and he did nothing else in regards to that nutritional care. Do you think that is consistent with the standard of care in Harris County, Texas, considering what you saw? Also, putting into that equation, when you saw the extent of the fistula and the effect when you saw her on November 17th, plus, together with the state of her nutritional care; that is, she was severely malnutritioned, as you've testified. Did you think that would be good nutritional care to tell her that?

(Dr. MacFadyen): Well, *I think I might* have been more specific about what she needed to take in, and if she was not able to take those things in, I think that, you know, something had to be done; either supplements had to be provided or somehow vitamins needed to be given preemptorily as injections or something else. She was not able to take those types of things in by mouth.

(Emphasis added.)

Because the appellee failed to establish the standard of medical care, the trial court erred in denying the appellant's motion for an instructed verdict. I would reverse and render this case in favor of the appellant.