Opinion issued January 31, 2013.



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00079-CV

———————————

**FAIRWAYS OFFSHORE EXPLORATION, INC., Appellant**

**V.**

**PATTERSON SERVICES, INC. AND CUDD PRESSURE CONTROL, INC.,**
**Appellees**

On Appeal from the 215th District Court
Harris County, Texas
Trial Court Cause No. 2007-59388

## CONCURRING MEMORANDUM OPINION

I join in the Court's opinion and specifically agree with the Court that expert

testimony is generally required to prove the standard of care for a reasonably

prudent sour gas owner. But the standard of care may also be established by other evidence in some circumstances. I write separately to address why the other evidence offered by Patterson Services, Inc. did not establish the standard of care.

## Introduction

Sour gas is a natural gas containing significant amounts of hydrogen sulfide ($H_2S$), a corrosive that is lethal to unprotected humans. T-95 is an $H_2S$ resistant pipe. In late November 2006, a joint of T-95 in a sour gas well broke during snubbing operations, causing a blowout along with damage to the pipe and other equipment and eventually causing the well's lessee and owner, Fairways Offshore Exploration, Inc., to shut it down. The T-95 pipe in the well, which was known as the Federal 1-8, was initially protected from exposure to the $H_2S$ by a "blanket" (or "pad" or "barrier") of nitrogen gas (which is benign to humans) that was pumped into the well, pushing the $H_2S$ down into the well and away from the surface.

Fairways, a company with only ten employees, hired Cudd Pressure Control, Inc. to perform snubbing services. Snubbing involves using a snubbing unit to run pipe into and out of a well using a hydraulic workover rig while completing the well "under pressure." The snubbing unit was necessary because the well contained several deviations, as it was directionally drilled. Cudd recommended

that Fairways lease the T-95 pipe from Patterson as the work string for Federal 1-8.[1]

During the snubbing operations, a packer was set at a depth of approximately 15,000 feet. But the setting tool that is on top of and sets the packer would not release, causing it, along with the packer and the work string, to become stuck. After unsuccessful attempts to pull the tool loose, Fairways instructed Cudd to gradually increase the pull on the setting tool at 2,000 pound increments every five minutes until its sheer pin snapped and released the tool. According to the evidence, this is a standard procedure for attempting to release the tool. By the end of the day, the Cudd crew was pulling with 115,000 pounds of force but the setting tool still had not released. Fairways, at Cudd's insistence, then shut down Federal 1-8 for the evening.

Fairways, after consulting with Baker Hughes, which had provided the setting tool, decided to "flow the well" overnight.[2] "Flowing the well" includes evacuating the nitrogen blanket. Mario Garcia from Cudd informed Gary Knape, Fairways's "company man" on site, that removing the nitrogen blanket could allow

---

[1] The work string is used to operate tools inside the well, as opposed to the pipe through which gas is produced from the well. Work strings are composed of joints of pipe.

[2] "Flowing the well" reduces the pressure in the well, increases the weight on the tubing string, and causes the string to be held in tension.

the $H_2S$ to damage Cudd's equipment and tubing, but Knape told Garcia that Fairways wanted to proceed. Garcia did not argue with Knape because he "felt comfortable with what we were going to do because our pipe was still . . . well within its limits to pull what we were going to pull." The removal of the nitrogen blanket exposed the top almost 5,000 feet of the well to the $H_2S$. The next day, the Cudd crew continued to pull on the setting tool with increasing pounds of pressure. After they reached 128,000 pounds of pressure, joint 18 of the T-95—which was located at a depth of over 500 feet below ground—broke.[3] The parties did not dispute that the pipe separated due to sulfide stress cracking, which occurs as pipe becomes brittle from exposure to $H_2S$; sulfide stress cracking cannot occur without exposure to $H_2S$; and if the nitrogen blanket had not been removed, the T-95 tubing would likely not have cracked from sulfide stress. The primary liability disputes were whether (1) treated pipe—like the T-95—should suffer sulfide stress cracking when it is placed in a well with a level of $H_2S$ that was "off the charts" without leaving the nitrogen blanket around it for protection and (2) the pipe's failure was caused by tong marks in the pipe from prior uses that made it susceptible to sulfide stress cracking or by the removal of the nitrogen blanket.

The jury found that Fairways's negligence caused the blowout and awarded Patterson, the pipe's owner, more than $420,000. But Patterson did not present any

---

[3] There were 499 joints of pipe with 481 joints below joint 18.

expert testimony that Fairways was negligent.[4] The jury's verdict necessarily means that it concluded that Fairways was wrong—or, to use Patterson's word, "improvident"—in its assessment that the use of $H_2S$ resistant T-95 pipe provided sufficient protection in itself so Fairways could safely flow Federal 1-8 and evacuate its nitrogen blanket. In other words, Patterson established that Fairways's decision to remove the blanket caused the blowout. But just because Fairways's decision was wrong does not mean that the decision was negligent. To demonstrate that it was negligent, Patterson had to demonstrate that Fairways failed to operate as a reasonably prudent operator. Patterson failed to do so.

### Requirement of Expert Testimony

To prevail on its negligence claim, Patterson was required to establish four elements: 1) Fairways's duty to act according to an applicable standard of care; 2) a breach of the applicable standard of care; 3) an injury; and 4) a causal connection between the breach of care and the injury. *Ethicon Endo-Surgery, Inc. v. Gillies*, 343 S.W.3d 205, 211 (Tex. App.—Dallas 2011, pet. denied); *Fence v. Hospice in the Pines*, 4 S.W.3d 476, 478 (Tex. App.—Beaumont 1999, pet. denied). I agree with the Court that "the proper operation of a sour gas well is not a matter within

---

[4] Patterson's metallurgist, Dr. Russell Kane, testified that the removal of the nitrogen blanket caused the incident; however, he was not permitted to testify that the operator was negligent in removing the blanket because he was not designated as an expert on negligence. Nor did he testify that a nitrogen blanket can never be removed or that it is common knowledge in the oil patch that a blanket cannot be removed.

the experience of laypersons. Specifically, whether or not the use of a nitrogen blanket in a well, such as the one in this case, was necessary to protect the well piping and equipment, would be unfamiliar to the ordinary person." Slip Op. at 15. I also agree with the Court that neither Dr. Russell Kane, a metallurgist and member of the National Association of Corrosion Engineers (NACE) retained by Patterson,[5] nor Mario Garcia, Cudd's supervisor over the snubbing crew at the Federal 1-8,[6] provided expert testimony on the standard of care. Thus, absent other evidence from which the jury could determine the applicable standard of care and a

---

[5]   Patterson also relies on Dr. Kane's testimony that the T-95 pipe at joint 18 failed because it experienced "the perfect storm" of (1) the high stress created as they pulled on joint 18, which was hanging in the well and supporting fifty-nine tons of other pipe below it; (2) the right temperature range present near the surface, which made the pipe most susceptible to sulfide stress cracking; and (3) a severe $H_2S$ environment. According to Dr. Kane, if the nitrogen blanket had not been removed, the other two conditions would not have been sufficient to cause the pipe to separate. This testimony, however, addresses causation, not negligence. *See generally Hager v. Romines*, 913 S.W.2d 733, 735 (Tex. App.—Fort Worth 1995, no writ) (rejecting "attempt to bootstrap lay witnesses' testimony on causation into expert testimony on a violation of the standard of care").

[6]   Garcia also testified that he told Gary Knape, Fairways's independent company man who acted as its "eyes and ears" on the job, that the removal of the nitrogen blanket could allow the $H_2S$ to come to the surface and damage its equipment and tubing. Knape, who reported to a Fairways engineer in Houston named Bobby Vasquez, told Garcia that Fairways wanted to proceed. But Cudd's "warning" does not establish a standard of care; it merely reflects Garcia's opinion about the proper course of action. Vasquez, Fairways's production superintendent, testified that Fairways was not concerned about pulling on the T-95 pipe to release the setting tool because it had a rated yield strength of 171,200 pounds of force and they planned to exert up to no more than 150,000 pounds of force. He claimed that Patterson represented to Fairways that T-95 pipe was suitable for an $H_2S$ environment without a nitrogen blanket.

6

violation of that standard by Fairways when it removed the nitrogen blanket, Patterson provided no evidence that Fairways failed to exercise the reasonable care that a reasonably prudent sour gas well operator would have exercised under the same or similar circumstances.

## Other Evidence on the Standard of Care

I write separately to explain why the other evidence offered by Patterson did not satisfy its burden to demonstrate Fairways's negligence. As an alternative argument, Patterson contends that it established Fairways's negligence through (1) Fairways's departure from its own well-completion procedures; (2) Fairways's use of a nitrogen blanket on another well; (3) concessions made by Fairways's vice president during his cross-examination; and (4) Fairways's failure to perform a well-condition analysis as required by the NACE standard MR0175. Fairways does not contest Patterson's assertion that when expert testimony is not presented on the standard of care but the conduct in question involved specialized equipment or expertise beyond the knowledge of other ordinary jurors, other evidence may, in certain narrow circumstances, establish the applicable standard. *See Brandt v. Surber*, 194 S.W.3d 108, 140 (Tex. App.—Corpus Christi 2006, pet. denied) (Castillo, J., dissenting) (stating that proof of applicable standard of care in claim of professional negligence "usually requires expert testimony"); *cf. Battaglia v. Alexander*, 177 S.W.3d 893, 899–900 (Tex. 2005) (holding that breach of

7

contractual duty for anesthesiologist's professional association to comply with standards specified in contract did not prove liability for negligent failure to render adequate medical care, and expert testimony was necessary to establish standard of care). I agree that although expert testimony is generally necessary to establish the standard of care when the matter is beyond the knowledge of ordinary jurors, that knowledge may be provided in some cases by other evidence, such as documentary evidence setting forth the standard of care. I, therefore, turn to whether such evidence existed in this case.

**1.     Fairways's well-completion procedures**

Fairways's well-completion procedures do not satisfy Patterson's burden of proving Fairways's negligence because Patterson misinterprets the procedures and, more importantly, the procedures do not establish what a reasonable operator would have done under the same or similar circumstances.

Fairways's completion procedures set out forty-one steps to be taken during well completion. Step eight—the step that Patterson claims was violated—concerns the application of the nitrogen blanket before snubbing. It requires that a nitrogen blanket be placed in the well before pipe is inserted into the well. It is undisputed that the blanket was applied before snubbing commenced. The question here was not the original placement of the nitrogen blanket but its removal after the setting tool became stuck. The completion procedures do not

address the steps to be taken in that situation.[7] Contrary to Patterson's contentions, Fairways's completion procedures did not forbid the removal of a nitrogen blanket during the operations in question.

Additionally, there was no evidence that the completion procedures could not be changed during the drilling process. On the contrary, there was evidence that the normal procedures governing the use of the nitrogen blanket might need to be revised based on changes in the drilling conditions. According to Bobby Vasquez, Fairways's production superintendent, "under the completion procedure, the nitrogen blanket would stay in the well until the very last operation in which the work string was removed . . . unless anything changed on the well [so] that we need[ed] to do something different."[8]

Most importantly, there was no evidence that Fairways's procedures reflect an industry custom or practice. An industry custom or practice is some evidence of the standard of care in typical negligence cases. *Kissinger v. Turner*, 727 S.W.2d

---

[7] Mario Garcia, Cudd's supervisor over the snubbing crew at the Federal 1-8, also testified that Fairways's well-completion procedures required a "nitrogen pad to be applied to the well bore before any tubing was run into the well." He pointed out that the procedure did not contain any provision allowing the blanket to be removed "while Cudd was running equipment into the well." But neither did the completion procedures forbid such action; they were simply silent on the matter.

[8] For example, although the procedure called for the packer to be set on a wire line, the packer was actually set on tubing because of concerns that the wire line might get stuck.

750, 755 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.). Patterson relies on *Bay Rock Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 298 S.W.3d 216 (Tex. App.—San Antonio 2009, pet. denied), for the proposition that a manual or industry practice may establish the applicable standard of care. In that case, the jury found that a drilling engineering firm negligently caused a well's blow-out. *Id.* at 222. The plaintiff presented expert testimony that the firm's decision to drill without running certain tests was negligent and caused the blowout. *Id.* at 227−28. On appeal, the firm contended that there was no evidence of causation; however, it did not raise a no-evidence challenge to the negligence finding. *Id.* at 222.

*Bay Rock* is distinguishable from this case. There, the plaintiff relied on both expert testimony and a manual. The manual reflected industry practices. In contrast, the existence of an entity's internal manual setting forth its own procedures does not, standing alone, establish a standard of care. *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 92 (Tex. 2004); *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 351–52 (Tex. App.—Beaumont 2010, pet. denied)*; Owens v. Comerica Bank*, 229 S.W.3d 544, 547 (Tex. App.—Dallas 2007, no pet.); *Guerra v. Regions Bank*, 188 S.W.3d 744, 747 (Tex. App.—Tyler 2006, no pet.); *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 413 (Tex. App.—Fort Worth 2003, no pet.); *see also Jacobs–Cathey Co. v. Cockrum*, 947 S.W.2d 288, 291–92 (Tex. App.—Waco 1997, pet. denied) (holding that

company's internal policy of removing debris left at its work sites by other parties did not impose upon company legal duty to parties injured by unremoved debris); *Estate of Catlin v. Gen. Motors Corp.*, 936 S.W.2d 447, 451 (Tex. App.—Houston [14th Dist.] 1996, no writ) (holding that company's safety policies restricting consumption of alcohol on its premises did not create legal duty that would subject company to liability for failing to comply with policies). As explained in *FFE*, a company's self-imposed policy or practice, "taken alone, does not establish the standard of care that a reasonably prudent operator would follow." *FFE Transp. Servs.*, 154 S.W.3d at 92; *see also U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 139 (Tex. 2012) ("The mere existence of federal regulations does not establish the standard of care.").

## 2.    Exhibit 60

Patterson next relies on a Fairways's daily time-entry report reflecting the use of a nitrogen blanket on another $H_2S$ well near Federal 1-8. Patterson contends that this report is evidence that Fairways had used a nitrogen blanket on a "sister well to protect equipment and tubing in a similar fishing operation to retrieve stuck equipment in [a sour gas] well" and establishes a general industry practice.

The mere fact that Fairways used a nitrogen blanket during a fishing operation on another well—even if we were to assume that the well and its equipment were similar to Federal 1-8—is not evidence that it is customary to use

a nitrogen blanket on wells or that the failure to do so constitutes a lack of ordinary care. Testimony that a defendant engaged in the suggested conduct on one other occasion may be *admissible* to show the standard of care but is insufficient to *establish* that standard of care. *See Webster v. Johnson*, 737 S.W.2d 884, 887 (Tex. App.—Houston [1st Dist.] 1987, writ denied) (holding that plaintiff did not meet burden of proof merely by showing that procedure "was not compatible with that utilized by other doctors in Harris County"); *see also Whittley v. Heston*, 954 S.W.2d 119, 123 (Tex. App.—San Antonio 1997, no pet.) (observing that "[a] testifying expert cannot establish the standard of care by simply stating the course of action he would have taken under the same or similar circumstances."); *Warner v. Hurt*, 834 S.W.2d 404, 407 (Tex. App.—Houston [14th Dist.] 1992, no writ) (observing same). Evidence that Fairways followed a particular procedure on a different, but similar, well does not establish that it is customary, ordinary, or standard to do so in the industry. *Cf. King v. Bauer*, 688 S.W.2d 845, 846 (Tex. 1985) (evidence was legally sufficient based on evidence of "usual or standard" method of treating a patient); *Brown v. Lundell*, 344 S.W.2d 863, 867−68 (Tex. 1961) (evidence of custom is evidence of negligence).

3.   **Gracia's Testimony**

Patterson next cites concessions made by Homero Gracia, Fairways's vice president of drilling and a natural gas engineer who had responsibility for

Fairways's completion and workover operations. Gracia was an expert witness on engineering principles with "knowledge" about the pipe used in Federal 1-8. He conceded there was a "possibility" and that it was "foreseeable" that the pipe might separate at the time of the incident in question. He explained that the possibility of separation existed because the crew was "pulling on" the pipe to dislodge it, not because of the $H_2S$.[9] He stated that the reason blow-out preventers exist on a well is that sometimes the unexpected, but nevertheless foreseeable, will occur on a well. He also admitted that Fairways deliberately chose to flow the well and thus put it into direct contact with the $H_2S$. But, according to Gracia, the risk that the pipe would separate as a result of the nitrogen blanket's removal was virtually non-existent because the use of T-95 piping was "the correct material for the $H_2S$." Therefore, he "didn't even consider what affect the $H_2S$ might have on the pipe to make it more likely to part."

Gracia did not testify that Fairways was negligent. He was only asked one question that encapsulated words ordinarily used in a discussion of negligence— e.g., "reasonable," "ordinary," or "standard of care"[10]—and he categorically

---

[9]   Mario Garcia, Cudd's supervisor over the snubbing crew at the well, also testified that "any time you're pulling on pipe with the snubbing unit there's a possibility that [the] pipe [might] part."

[10]  The jury charge defined "negligence" as the "failure to use ordinary care; that is to say failure to do that which a person of ordinary prudence would have done under the same or similar circumstances[.]" The charge defined "ordinary care" as "that degree of care which would be used by a person of ordinary prudence[.]"

rejected the assertion that Fairways did not act in a reasonably prudent manner because it did not defer to Patterson or other experts on whether the nitrogen blanket could be safely removed. In short, Gracia's testimony did not establish a standard of care for an operator.

## 4.    NACE MR0175

Patterson also relies on Fairways's failure to perform a well-condition analysis which Patterson contends was required by standards adopted by NACE. The Court addresses Dr. Kane's testimony about these standards but a little more detail about the standards themselves may be helpful.

NACE standard MR0175 provides "requirements and recommendations for the selection and qualification of metallic material for service in equipment used in oil and gas production . . . in $H_2S$-containing environments." MR0175 "addresses all mechanisms of cracking that can be caused by $H_2S$, including sulfide stress cracking [and] stress corrosion cracking." Materials that meet its criteria "are resistant to cracking in defined $H_2S$-containing environments in oil and gas production but are not necessarily immune under all service conditions." It is undisputed that Fairways was the "user" under the NACE standard. Dr. Kane, the metallurgist and NACE member retained by Patterson, testified that MR0175 is a standard that is used in the oil industry. I agree with the Court that neither the standard itself, nor Kane's explanation of the standard, established the standard of

care for a reasonably prudent sour gas well owner under the circumstances in question.

MR0175 requires the equipment's user to:

[D]efine, evaluate and document the service conditions to which materials may be exposed for each application. The defined conditions shall include both intended exposures and unintended exposures which may result from the failure of primary containment and protection methods. Particular attention shall be paid to the quantification of those factors known to affect the susceptibility of materials to cracking caused by $H_2S$.

Factors other than material properties, known to affect the susceptibility of metallic materials to cracking in $H_2S$ service include: $H_2S$ partial pressure, in situ pH, the concentration of dissolved chloride or other halide, the presence of elemental sulfur or other oxidant, temperature, galvanic effects, mechanical stress, and time of exposure to contact with a liquid water phase.

Two annexes, C and D, to the standard are entitled "informative" and set forth respectively the calculation for determining a well's $H_2S$ partial pressure and pH. These calculations "shall be used . . . to provide the basis for the reassessment of the suitability of existing alloys of construction . . . in the event of changes to the actual or intended service conditions."

Patterson contends that the decision to flow the well overnight "represented a change in 'actual service conditions' of the pipe under MR0175," and therefore Fairways was required to make the calculations set forth in those standards. It was

15

undisputed that Fairways did not make such calculations.[11] Even if expert testimony was not necessary to establish that the stuck setting tool constituted a change in actual service conditions[12] and that it is the operator's responsibility to perform the calculations, there was no evidence that a reasonably prudent operator with knowledge of the results of the calculations would not have evacuated the nitrogen blanket. Dr. Kane calculated that, based on a chart in MR0175, the partial pressure in Federal 1-8 was "off the charts." The chart included a table requiring an assessment of "[t]he severity of the sour environment" using partial pressure and pH. Kane opined that had Fairways calculated the partial pressure of $H_2S$ in the Federal 1-8 well, it would have determined the $H_2S$ concentration in Federal 1-8 was multiple times higher than the amount shown on the chart for assessing the severity of the environment. He explained that although T-95 pipe passed its

---

[11] Homero Gracia, Fairways's vice president, acknowledged that, after the packer setting tool became stuck in the well, Fairways did not calculate the $H_2S$ partial pressure in the well before deciding to remove the nitrogen blanket. Fairways also did not calculate the NC2 pH, determine the presence of elemental sulfide or other oxidants in this well, analyze its galvanic affects, or evaluate the well's temperatures.

[12] There was no testimony on this issue. Gracia did not testify that an operator such as Fairways should be aware of the need to conduct these calculations or that it is customary in the industry for an operator to make such calculations. On the contrary, Gracia disclaimed any responsibility for performing calculations: "It's not my job. . . . I'm not the one who knows the capabilities of your system . . . . It is the responsibility of the companies like Cudd to know their equipment and what the failure points are. We don't know what they are, so when you -- you work with it every day, and you should know what -- where a system will fail or not fail." According to Gracia, it was Fairways's responsibility to ensure that it selected the proper pipe for the environment, not that it adjusted as the environment changed.

testing in a 100% $H_2S$ environment and therefore was approved by the NACE standard, that is not the most severe or stressful environment; the effect of both the $H_2S$ concentration and the partial pressure must be determined to evaluate the environment's overall stress. According to Kane, the T-95 pipe needed to be protected from the severe environment at Federal 1-8 even though it satisfied the NACE standard. Kane opined that T-95 pipe can fail under severe environmental conditions at lower than the rated tensile strength.[13] The protection is accomplished by controlling the environment, and one way to do that is to use a nitrogen blanket.[14]

---

[13]    Much of Dr. Kane's testimony was disputed by Fairways's expert, Dr. John Slater, who is also a metallurgist. Dr. Slater likewise did not address the standard of care; rather, his testimony, like Kane's, focused on why the pipe failed. According to Slater, T-95 pipe is a well-recognized material that should—because of its chemistry and metallurgy—resist failure in hydrogen sulfide environments, including a well in which the $H_2S$ level was "off the charts." According to Slater, T-95 pipe is resistance to sulfide stress cracking at all temperatures and had been tested in "a very, very nasty hydrogen sulfide environment" that is "about as nasty as you can get." Slater opined that the pipe's failure was due not to the removal of the nitrogen blanket, but to the pre-existing tong marks on the pipe that caused indentations to the tubular steel, resulting in changes to its characteristics and making it susceptible to sulfide stress cracking. "[W]hat we have here is a resistant material being made vulnerable to the sulfide stress cracking environment as a result of the way it had been mishandled and the tong marks that had been placed on there."

Slater explained that the well's environment would have caused sulfide stress cracking on non-resistant materials, and he contended that the presence of the indentations on the piping "basically turn[ed] that originally non-vulnerable material into a vulnerable material … as a result of the indentations."

[14]    Contrary to Patterson's assertions, Dr. Kane did not testify that "prudent operators of sour gas wells typically control the down environment by using 'inhibitors'

But Dr. Kane did not testify that Fairways should have known this information or that a reasonably prudent operator would have known it. According to Kane, MR0175 does not quantify an "amount of $H_2S$ that T-95 can be exposed to." Moreover, T-95 is proper for "any application for $H_2S$." While nitrogen does provide additional protection for pipe, Kane admitted that MR0175 does not state that an operator should use a nitrogen blanket to protect T-95. Kane also acknowledged that MR0175 provides no limits on the amount of the $H_2S$ concentration to which the pipe may be exposed based on amount of the partial pressure or the pH. MR0175 also does not limit the use of the pipe to any temperature range. He also conceded that standard does not discuss the use of nitrogen blanket to protect the pipe. Kane expressly conceded that he was not opining about Fairways's conduct and he did not testify what Fairways's conduct should have been if it had performed the calculations required by MR0175.

Moreover, MR0175 does not state the significance of the calculations or warn that certain actions should or should not be taken based on the results of the calculations; MR0175 merely compares the severity of different conditions. MR0175 therefore establishes, at most, that Fairways violated the standard of care by failing to perform the required calculations, but it does not establish that, if

such as nitrogen to prevent equipment damage." Kane never used the words prudent, reasonable, ordinary, or typical in describing the acts or omissions of either Fairways or operators generally.

Fairways had performed the calculations, Fairways would have, or should have, acted in a different manner.

## Conclusion

I agree with the Court that expert testimony on the standard of care for a reasonably prudent sour well owner is generally necessary when a plaintiff claims the completion operations were performed negligently. While evidence on the standard of care might be provided by sources other than expert testimony, none of the other evidence in this case demonstrated the standard of care. Patterson offered other evidence that Fairways made a wrong decision in removing the nitrogen blanket but none of its evidence demonstrated that a reasonably prudent owner would have known in advance that its decision was unreasonable. I therefore concur in the Court's opinion and judgment.

Harvey Brown
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Justice Brown, concurring.

19